[Cite as *State v. Simmons*, 2014-Ohio-3695.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-130126 |
| | | TRIAL NO. B-1104759A |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N.* |
| LAMAR SIMMONS, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, Sentences Vacated, and Cause Remanded

Date of Judgment Entry on Appeal: August 27, 2014

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*David Hoffmann, Josh Thompson* and *Christine Y. Jones,* for Defendant-Appellant.

**CUNNINGHAM, Presiding Judge.**

{¶1} Defendant-appellant Lamar Simmons appeals from the judgment of the Hamilton County Court of Common Pleas convicting him, after a jury trial, of the murder of Anthony Thompson and the offense of having weapons under a disability. Simmons's assertions that the trial court erred by overruling his motions for a mistrial with prejudice and that he was denied a fair trial based on discovery violations are not supported by the record, because the state's delayed disclosure of some evidence helpful to the defense was not willful and the evidence was disclosed in sufficient time for Simmons to effectively use it at trial.

{¶2} Simmons has failed to demonstrate that he was entitled to a mistrial or a new trial based on other alleged misconduct by the prosecutor, the admission of other-act evidence, the denial of his right to the effective assistance of counsel, or the trial court's failure to record the sidebar conferences in accordance with Crim.R. 22. Moreover, after our review of the evidence, we hold that Simmons's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. But the trial court's imposition of consecutive terms of imprisonment was contrary to law where the trial court failed to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing. Therefore, we vacate Simmons's sentences and remand the cause for resentencing.

### Background Facts

{¶3} On March 8, 2011, at approximately 9:28 p.m., Thompson was shot to death in the hallway of an apartment building located at 215 Mulberry Street in the Mt. Auburn area of Cincinnati. At the time of the shooting, Thompson had been arguing with his on-and-off girlfriend, Samirrah Kelsey, who lived in the building with her five children, three of whom were fathered by Simmons. Kelsey and Simmons were no longer in an intimate relationship, but they occasionally had

sexual encounters, and Simmons saw the children several times a week. James Daniel, Kelsey's brother and Simmons's codefendant, sometimes stayed with Kelsey. Daniel and Simmons had become friends over the years, having a mutual interest in the well-being of Kelsey and her children.

{¶4} Less than a week before the shooting, Thompson had called 241-KIDS to report that Kelsey had left the children alone without adult supervision. As a result, on March 3, 2011, Kelsey was charged with child endangering. Her children were removed and her job and housing assistance were "put on hold."

{¶5} Kelsey soon learned that Thompson had not only called 241-KIDS, but that he had also taken money and other items from her apartment. She was angry at Thompson and distraught over losing her children and her voucher, and she shared this information with Daniel, Simmons and her sister Simone Kelsey ("Simone") in the days leading up to the shooting.

{¶6} In response to one of her text messages about her situation, Simmons wrote back, "That's crazy he got to pay." In the evening of March 7, 2011, the day before the shooting, Simmons had texted to her, "You know I been thinking a lot[;] this nigga fucked up everything you had going." Kelsey replied that she knew that and that she was thinking about "buy[ing] a gun [and] just doing the time" because she "hurt" so much from not seeing her children.

{¶7} On the day of the shooting, at 6:34 p.m., Kelsey texted her brother Daniel that she was going to call Simmons and tell him about Daniel's plan, in which Daniel would be there to "watch," "because he [Simmons] ready rite knw." Daniel replied, "Its on."

{¶8} Kelsey and Thompson then had dinner together at a restaurant. During dinner, Kelsey became angry at Thompson and left, taking the bus home to her apartment on Mulberry Street. A short time later, Thompson showed up at her apartment. Thompson knocked on her window, and she eventually let him into her

apartment. Thompson wanted to take back his DVD player and to talk, and they ended up arguing in the first floor hallway of the apartment building.

{¶9} Meanwhile, Simmons and Daniel consistently communicated with each other by the use of their cell phones to carry out their plan to ambush Thompson. Daniel texted Simmons at 8:32 p.m. to let him know that he had arrived at Kelsey's apartment. Simmons asked if Kelsey was there. At 8:35 p.m., Daniel texted to Simmons that Kelsey was not answering her phone and had locked him out, so he would just wait for her. Simmons immediately replied, "We cant do nothing tonight." The two then exchanged a series of phone calls. At 9:01 Daniel texted back, "When you send this tex. We cant do nothing tonight." Simmons replied, at 9:14 p.m., "Leaving the house." The two men then had a short conversation using their cell phones that ended at 9:16 p.m.

{¶10} About 12 minutes later, Kelsey's and Thompson's argument in the hallway of Kelsey's apartment building was interrupted by someone banging on the outside door to the building. Thompson opened the door, but the heated argument resumed. A person dressed completely in black, including a black mask, came in through the open door. Thompson moved aside to give the person access to the stairwell. Kelsey then saw the person shoot Thompson. She immediately dropped to the floor and covered her face.

{¶11} Police communications received the first 911 call at 9:29 p.m. Three minutes later, when the police arrived, they found Thompson dead from gunshot wounds to his head, neck, torso, and arm, and Kelsey very upset. Detectives attempted to take fingerprints from the scene, but they did not take DNA samples.

{¶12} Kasey "Michelle" Coffey, who lived on Seitz Street, located one street above and parallel to Mulberry Street on the Mt. Auburn hillside, reported to the lead investigator on the case, Detective Jacob Wloszek, that she had heard gun shots and a scream as she unloaded groceries from her car parked on Seitz Street. She then

had seen two "black" individuals run up the hillside steps that connected Mulberry and Seitz Streets and drive away in separate cars that had been parked on Seitz. Coffey reported that one car had contained a woman.

{¶13} Simmons and Daniel were later co-indicted for Thompson's murder. The indictment included one count of murder in violation of R.C. 2903.02(A), with a firearm specification, and separate counts charging the offense of having weapons under a disability. Simmons and Daniel were tried separately.

### *The Case Against Simmons*

{¶14} Daniel testified for the state at Simmons's trial, although the charges related to Thompson's shooting were still pending against him. Daniel stated that on March 8, 2011, the night of the shooting, he and Simmons had carried out a plan to confront and harm Thompson, as desired by Kelsey. To that end, after Kelsey had left her dinner with Thompson, Daniel had gone to Kelsey's apartment to check on Kelsey and to see if Thompson would appear. When Thompson arrived, Daniel observed him arguing with Kelsey in the common hallway of Kelsey's apartment complex. Daniel contacted Simmons by cell phone to advise him of what he had seen. Simmons then drove to meet Daniel on the street above Mulberry Street, where Daniel had moved his car. Daniel's girlfriend, Latrice White, waited in his car.

{¶15} From the vantage point, Daniel and Simmons viewed Kelsey and Thompson arguing inside the apartment building. Simmons pulled out a semi-automatic handgun, descended the hillside steps to Mulberry Street, and knocked on the outside door of Kelsey's apartment building. Daniel followed him, but Simmons ordered him to wait outside the building. Daniel saw Simmons enter the building when someone opened the door. Daniel then heard several shots and a scream. After Simmons ran out of the building, Daniel and Simmons ran up the hillside steps to their cars and drove off to separate places.

{¶16} The two communicated several more times during the next two days, including the morning after the shooting, when Daniel sent Simmons a text that he "love[d]" him "flatout." Simmons responded, "Who you love." Daniel responded, "U nigga."

{¶17} Daniel was cross-examined on his statements given to Detective Wloszek during a police interview. Daniel admitted that he had first denied being at the scene of the crime and any involvement with the murder. He also acknowledged that during the interview he had made a comment, later retracted, that suggested Simone had been in the hallway with Kelsey and Thompson during the shooting.

{¶18} Daniel's trial testimony concerning the shooting was corroborated to some extent by Coffey, who testified that she had seen two people run up the hillside steps and drive off in two cars, one containing a female, after the shooting. At first Coffey testified that the two people were black males dressed in black and wearing skull caps or hoods and whose skin appeared dark in the evening light, but on cross-examination she conceded that they could have been "good sized female[s]."

{¶19} In addition to Daniel's eyewitness testimony, Kelsey testified that Simmons had told her "that he was sorry for the incident that happened in the hallway." Because of the way he said it, she understood his statement to be an admission to shooting Thompson, and she immediately told Simmons to stop talking to her. She later shared Simmons's "admission" with the police, but she was reluctant to share it with the jury.

{¶20} The state also presented circumstantial evidence establishing Simmons's guilt. This included cell-phone data for the day of the shooting and the days around the shooting from accounts linked to Daniel, Kelsey and Simmons. These records, authenticated by Cincinnati Bell employee Pamela Papke, contained the text messages and the call log that validated the state's theory that Simmons had participated in a planned ambush of Thompson.

{¶21} However, the records also reflected that Daniel had received a text on the morning after the shooting from an unknown phone number indicating that the person texting had had to throw away a gun. Detective Wloszek testified that during the investigation he had dismissed the message as unrelated to Thompson's murder and had not determined who had sent the message.

{¶22} The main theme of Simmons's defense, as first set forth in opening statement, was that Kelsey and her siblings Simone and Daniel had taken revenge against Thompson for calling 241-KIDS and that they were protecting each other at Simmons's expense. Defense counsel moved for a mistrial on several occasions due to discovery issues and the admission of other-act evidence. The trial court overruled these motions.

### The Verdict and Sentence

{¶23} The jury found Simmons guilty of murder, but not guilty of an accompanying firearm specification, and guilty of having weapons under a disability. At trial, Simmons had stipulated that he was under a disability from a prior conviction that prevented him from having a weapon. Simmons then moved for a new trial and for a judgment of acquittal notwithstanding the verdict.

{¶24} The trial court overruled Simmons's post-trial motions, and sentenced Simmons to an indefinite term of life in prison for the murder and three years in prison for the weapons offense, to be served consecutively to the indefinite life term.

{¶25} On appeal, Simmons assigns seven errors: (1) prosecutorial misconduct, including discovery violations, and the admission of other-act evidence, denied him due process and a fair trial; (2) he was denied the effective assistance of counsel; (3) the court's imposition of consecutive prison terms was contrary to law; (4) the court erred by failing to record sidebar conferences; (5) the court erred by overruling his motions for a mistrial based on the prosecutor's misconduct, including discovery violations, and the admission of other-act evidence, (6) his convictions

were not supported by sufficient evidence; and (7) his convictions were against the manifest weight of the evidence.

### *Discovery and Due-Process Violations*

{¶26} Simmons's first and fifth assignments of error involve, in part, the state's failure to provide discovery. To aid our analysis of the issues related to the discovery violations, including any due-process violations, we set forth the facts of the discovery violations in some detail.

{¶27} The record demonstrates that Simmons requested discovery in the case soon after his indictment and that the state had provided a response to that request. Simmons later moved to compel the disclosure of several items, but he withdrew his motion upon the state's supplemental responses. The state supplemented its response about a week before trial when it first named Daniel's girlfriend White as a potential witness. Neither party called White to testify at trial.

{¶28} *Kasey "Michelle" Coffey*. On Wednesday, January 25, 2013, after the conclusion of voir dire, the court learned that the state had violated the discovery rules when it had failed to name Kasey "Michelle" Coffey as a witness and to provide her statement to Simmons prior to trial.

{¶29} The prosecutor explained to the court that the delayed disclosure of the witness had resulted from Detective Wloszek's confusion of Coffey with another witness with the first name of Michelle, Michelle Evans, who had been timely disclosed to the defense and who had been interviewed as a witness. Detective Wloszek claimed that he had taken an oral statement from Coffey, who he had also known as the confidential informant "Sammy," several days after the murder, and that he had summarized that statement in an investigative log. The prosecutor claimed that he had just learned of the mistake.

{¶30} Simmons first moved to exclude Coffey, characterizing the delayed disclosure as suspicious because he claimed it coincided with the unavailability of

another state's witness who the state had believed could provide similar testimony, an allegation not substantiated by the record. After defense counsel was provided with Detective Wloszek's summary of Coffey's statement and an opportunity to meet with Coffey, the trial court held an evidentiary hearing, at which both Detective Wloszek and Coffey testified. Their testimony conflicted with respect to the details of Coffey's statement and how and when it was made, but Coffey's testimony corroborated Detective Wloszek's testimony with respect to his confusion of her with another witness at court on the previous day. Upon hearing this testimony, defense counsel moved for a mistrial with prejudice.

{¶31} After concluding that the delayed disclosure was due to a mistake, and not bad faith, the court overruled the motion to exclude Coffey and the motion for a mistrial. The court offered Simmons any continuance that defense counsel would need to prepare for Coffey's testimony.

{¶32} Defense counsel declined the court's offer of a continuance and stated that he would be ready to proceed the following morning. Consistent with this statement, defense counsel appeared the following morning and the case proceeded to opening statement without any indication from defense counsel that he was not prepared to go forward. The state called Coffey as its fourth witness, and defense counsel thoroughly cross-examined her.

{¶33} *May 2011 Cell-Phone Documents*. Later, on Monday, January 28, defense counsel learned that the state had failed to disclose a search warrant, accompanied by a supporting affidavit signed by Detective Wloszek, that ordered Cincinnati Bell to disclose Simone's cell-phone records for the dates of May 3 through May 6, 2011. In the affidavit, Detective Wloszek had indicated that Simone was suspected of murdering Thompson.

{¶34} Defense counsel learned of the nondisclosure when Detective Wloszek was asked during cross-examination why he had not interviewed Simone and

9

obtained her cell-phone records. Detective Wloszek testified that he had obtained Simone's cell-phone records from the phone company and that he had given the resulting report to the prosecutor. Defense counsel then objected and informed the court that the defense had not received that report or the warrant and affidavit. The trial court continued the case until the next morning, and ordered the prosecutor to investigate the allegation and to share the outstanding materials with defense counsel.

{¶35} The following morning, the prosecutor informed the court that he had learned that the state also had not turned over the warrant for and the resulting report related to the cell-phone records of Simmons or Daniel for the dates of May 3 through May 6, 2011. The prosecutor then explained that the former prosecutors assigned to the case, after speaking with Detective Wloszek, had determined that none of the May cell-phone documents contained any evidence for the state or any *Brady* material to provide to defense counsel. Because of this, the prosecutors had not requested these documents from Detective Wloszek and had not made copies to give to defense counsel.

{¶36} Defense counsel suggested that the court order a two-month continuance, but after reminding the court of the other discovery issues in the case, including the late disclosure of Coffey, he contended that the cumulative errors had affected Simmons's right to a fair trial and mandated the granting of Simmons's motion for a mistrial with prejudice. Defense counsel argued the violation involved willful misconduct because the prosecution had earlier notice of the violation from Detective Wloszek's knowledge and had failed to cure the violation at the first opportunity. Defense counsel explained that several days prior, when Papke was testifying for the state, defense counsel had asked Papke if Cincinnati Bell had received an order compelling the production of Simone's cell-phone records. Papke replied that she was not personally aware of such an order filed with her office.

10

Detective Wloszek had remained in the courtroom during this testimony, but he did not tell the prosecutor that he had actually obtained Simone's cell-phone records from Cincinnati Bell.

{¶37} The trial court considered defense counsel's arguments, and found that it would have been "helpful" for the defense to have had the search warrant and the affidavit listing Simone Kelsey as a suspect. Although the court did not find any willful violation of the discovery rules or bad faith, the court did sharply criticize the state for failing to characterize the warrant and affidavit as favorable evidence.

{¶38} The court was aware that the final discovery violation had come to light late in the state's case, but the court declined to grant a mistrial with prejudice at that time under the circumstances, believing that the sanction of "last resort" was not appropriate. Instead, the court continued the case until the following day to allow defense counsel to review the records that had not been provided in discovery and to have the opportunity to interview Simone, who had been identified as a potential state's witness in earlier discovery.

{¶39} The trial court continued the case an additional day because Simmons was not available. Before resuming the trial on Thursday, January 31, the trial court inquired as to whether defense counsel had received and reviewed all of the relevant documents. Defense counsel indicated that he had reviewed the documents, that the cell-phone reports did not contain anything of significance, and that he had also been provided an opportunity to contact Simone but he had chosen not to do so. Defense counsel indicated that he was ready to proceed, and he resumed the cross-examination of Detective Wloszek, armed with the missing discovery to further inculpate Simone.

### Claims based on Discovery Violations

{¶40} Simmons argues that the trial court should have granted his motions for mistrial after learning of the discovery violations by the state. We note that Simmons sought not just a mistrial, but a "mistrial with prejudice" to the state, meaning that the state could not retry him for the charged offenses. Simmons also argues that the discovery violations denied him a fair trial and warrant the granting of a new trial.

{¶41} *The Discovery Rules*. Generally, discovery violations in criminal cases are governed by Crim.R. 16. The Supreme Court has recently explained the trial court's duty with respect to discovery violations by the state in *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971. When a discovery violation occurs, the trial court has discretion to make any order that the court "deems just under the circumstances." Crim.R. 16(L)(1); *Darmond* at ¶ 33.

{¶42} The trial court's discretion includes ordering the most severe sanction, a mistrial with prejudice, *Darmond* at ¶ 41, but only after inquiring into the circumstances surrounding the violations and taking into consideration (1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced. *Darmond* at ¶ 35, citing *State v. Parson*, 6 Ohio St.3d 442, 453 N.E.2d 689 (1983), syllabus. And, when determining the appropriate sanction, the court " 'must impose the least severe sanction that is consistent with the purpose of the discovery rules.' " *Darmond* at syllabus, quoting *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987).

{¶43} The *Darmond* court noted that the purpose of Crim.R. 16(A), as amended in 2010, is " 'to provide for a just determination of criminal proceedings and to secure the fair, impartial, and speedy administration of justice' " and that it does so by " 'expand[ing] the reciprocal duties in the exchange of materials' and [by]

'balanc[ing] a defendant's constitutional rights with the community's compelling interest in a thorough, effective and just prosecution of criminal acts.' " *Darmond* at ¶ 29, quoting the Staff Notes to the 2010 amendment to Division (A) of Crim.R. 16.

{¶44} Simmons sought the most severe sanction, a mistrial with prejudice. But the trial court investigated the circumstances of the discovery violations and found that the less restrictive sanction of a continuance was appropriate because it would provide defense counsel with the opportunity to review and use the undisclosed evidence. We find no abuse of the trial court's discretion.

{¶45} *No willful violations*. First, the trial court found no bad faith or willful violations. While knowledge on the part of a law enforcement officer must be imputed to the state in determining whether there was a violation of Crim.R. 16, a determination of willfulness focuses only the acts of the prosecution. *State v. Wiles*, 59 Ohio St.3d 71, 78-79, 571 N.E.2d 97 (1991).

{¶46} Notwithstanding the violation based on Detective Wloszek's mistake with respect to Coffey, the prosecutor explained that he was not aware Coffey was a witness until her existence was brought to the attention of the court. With respect to the violation related to the May 2011 cell-phone documents, the prosecutor admitted that the former prosecutor had been aware of those items but that the former prosecutor had believed, erroneously with respect to the subpoena and affidavit naming Simone as a suspect, that the state did not have to provide any of them to the defense. The trial court was satisfied that the representations of the prosecutor were credible, and we have no basis to question this conclusion. Moreover, it is undisputed that the prosecutor provided the information as soon it became available to him.

{¶47} *Benefit of earlier disclosure.* The trial court found that an earlier disclosure of Coffey's identity and Detective Wloszek's summary of her statement could have benefitted the defense. The trial court came to the same

conclusion with respect to the warrant and affidavit related to the May 2011 cell-phone records that identified Simone as a suspect.

{¶48} *No Prejudice from Delayed Disclosure*. With respect to the violation involving Coffey and her statement, the court ensured that defense counsel had access to Coffey for an interview and that defense counsel was provided Detective Wloszek's summary of her statement. This information was provided before opening statement. The trial court offered the defense a continuance, an offer that defense counsel declined after providing assurances that he was ready to proceed.

{¶49} With respect to the violation involving the May 2011 cell-phone records and related documents, the court made sure that defense counsel was provided with the materials, and the court granted a continuance so that defense counsel could evaluate those documents and use them before the conclusion of the trial. Defense counsel appeared two days later ready to proceed, and acknowledged that the only helpful evidence from these documents was Detective Wloszek's characterization of Simone as a suspect in the warrant and supporting affidavit.

{¶50} While the warrant and supporting affidavit were helpful to the defense for that reason, the defense had received other discovery casting Simone as a suspect and had used that other information at trial before learning of the warrant and supporting affidavit. For instance, the state had produced Kelsey's cellular phone records that included a text message dated March 5, 2011, from Kelsey to Simmons stating that "[her] other sister and brother wnt to bury [Thompson.]" And, in opening statement, defense counsel told the jurors the theme of the defense: that Kelsey and her two siblings Simone and Daniel "were livid and upset" at Thompson and "were highly motivated to cause harm" to him, and they were protecting "their blood" at Simmons's expense. Further, the state had identified Simone as a

potential witness before trial in early discovery, and therefore, Simmons had ample notice to interview her.

{¶51} Under these circumstances, we find no abuse of the trial court's discretion in overruling the motions for mistrial related to the discovery violations.

{¶52} *New Trial under Crim.R.16.* Simmons also argues that he is entitled to a new trial based on the discovery violations. The Ohio Supreme Court has held that the state's violations of Crim.R. 16 are reversible error "only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458, 653 N.E.2d 285 (1995), citing *State v. Parson*, 6 Ohio St.3d 442, 445, 453 N.E.2d 689 (1983).

{¶53} We have already held that the prosecutor's failures to disclose were not willful violations of the rule. Therefore, Simmons cannot demonstrate reversible error based on the state's violations of Crim.R. 16.

{¶54} *New Trial under Due Process Clause*. Simmons also argues that this court should grant him a new trial because the discovery violations deprived him of his constitutional right to a fair trial. Undoubtedly, the fair-trial guarantee of the Due Process Clause of the United States and Ohio Constitutions imposes upon the state the duty to disclose to the accused evidence material to his guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This duty extends to "any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

{¶55} But, "the Due Process Cause is not implicated when exculpatory evidence is disclosed during trial, *State v. Wickline*, 50 Ohio St.3d 114, 116, 552 N.E.2d 913 (1990), as long as the evidence is disclosed 'in time for its effective use at

trial,' *United States v. Smith Grading & Paving, Inc.*, 760 F.2d 527, 532 (4th Cir.1985), and the timing of the disclosure does not otherwise 'significantly impair[] the fairness of the trial.' " *State v. Tucker*, 1st Dist. Hamilton No. C-120446, 2013-Ohio-2882, ¶ 26, quoting *State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001).

{¶56} Simmons essentially argues that discovery material favorable to his defense was not disclosed in time for its effective use at trial. We review this claim, which involves many of the same issues rejected by the trial court when it overruled Simmons's motion for a new trial, in the context of the entire trial.

{¶57} Simmons complains that because of the late disclosure of Coffey, he could not interview her pretrial. But the prosecution made Coffey available before opening statements. Further, the trial court offered the defense a continuance and defense counsel determined that it was not needed. Moreover, the record demonstrates that Coffey was thoroughly cross-examined, such that she admitted that she could have seen females instead of males running up the Mulberry Street steps.

{¶58} Simmons also argues that he was prejudiced by the late disclosure of Detective Wloszek's "summary" of Coffey's statement. But defense counsel effectively cross-examined Coffey and Detective Wloszek on the details of Coffey's statement to the detective concerning her observations at the time of the shooting. Detective Wloszek admitted that Coffey, when testifying, had not adopted his summary of her statement, which indicted that she had seen two males running up the steps, but instead testified that she could have seen a male or female running up the steps. Simmons then highlighted this testimony in closing argument.

{¶59} Simmons also argues that his fair-trial rights were violated because he did not learn until the cross-examination of Coffey that her roommate "was interviewed by the police." But Simmons mischaracterizes Coffey's testimony, which

provided only that her roommate "did speak with police officers outside" of the apartment on the night of the shooting. And he has failed to show that this testimony was evidence material to his guilt or punishment. In summary, we are unable to discern from this record how the timing of the disclosures related to Coffey significantly impaired the fairness of the trial.

{¶60} We arrive at the same conclusion with respect to late disclosure of the search warrant and affidavit listing Simone as a suspect in Thompson's murder. Defense counsel was able to ask Detective Wloszek's about his "probable cause" to support the search warrant for Simone Kelsey's phone records. He was successful in obtaining Detective Wloszek's admission that he had suspected that Simone had been involved in the murder at one time, but that he had not exerted much effort to investigate her. Further, defense counsel was able to use this evidence in closing argument to bolster the theme of the defense that counsel had first presented in opening statement based on other evidence.

{¶61} Thus, the record does not demonstrate that the trial court abused its discretion by denying Simmons's motions for a mistrial based on the discovery violations, or that Simmons is entitled to a new trial based on those violations.

### Other-Act Evidence

{¶62} Simmons argues that the trial court abused its discretion by denying his motion for a mistrial based on Kelsey's references to his incarceration, and that Kelsey's references, as well as a similar reference by Detective Wloszek, amounted to prosecutorial misconduct that warranted a new trial.

{¶63} At trial, Kelsey referred to Simmons's incarceration twice during direct examination. The first reference occurred after the prosecutor had asked her when she and Simmons had last had sex. She responded, "I guess right before Mr. Simmons got *locked up.*" The next reference occurred when the prosecutor began to question Kelsey about a statement that she had made to the detectives concerning a

conversation that she had had with Simmons and in which Simmons had implicated himself. In response to the prosecutor's question about her statement, Kelsey stated that she had told the detectives "that Lamar had come to me one night before he, I guess, got *incarcerated.*"

{¶64} After both of Kesley's improper references, Simmons objected. The trial court provided a limiting instruction with respect to the testimony, and found that Simmons could have a fair trial despite the comments.

{¶65} Later in the trial, Detective Wloszek was asked about the course of the investigation that allowed him to identify Simmons's cell-phone number. Detective Wloszek testified that after learning the names of Kelsey's children and the names of their fathers, the police "began to look in a little bit more to whom Mr. Simmons and the other children's fathers were including an RCIC background check, which is short for *Regional Crime Information Center.* We entered Mr. Simmons's name into the computer--." Defense counsel then objected. After a sidebar conference, which resulted in an agreement that the prosecutor would reword his question, the prosecutor asked Detective Wloszek whether he was able to associate a telephone number found in Kelsey's databank with Simmons. Detective Wloszek replied, "Yes."

{¶66} *Mistrial.* The granting or denial of a motion for a mistrial rests in the sound discretion of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92, citing *Glover v. Ohio*, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). The trial court need not declare a mistrial "unless the ends of justice so require and a fair trial is no longer possible." *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). The trial court is in the best position to determine whether the circumstances warrant the declaration of a mistrial. *Ahmed* at ¶ 92.

{¶67} Simmons moved for a mistrial with prejudice based on Kelsey's reference to his incarceration twice during direct examination. Defense counsel moved for a mistrial in part based on the argument that these references did not

merely place improper and prejudicial evidence before the jury, but that the prejudice from the remarks extended beyond the immediate effect on the jury and undermined the defense. Defense counsel explained to the trial court his belief that Kelsey's multiple visits to the Hamilton County Justice Center to see Simmons and Daniel demonstrated her complicity. The defense could have mentioned these repeated visits as evidence of Kelsey's complicity, but instead the defense decided, as part of a "trial strategy," that the cost of revealing the incarceration to the jurors, and invoking the stigma of incarceration, was not worth the benefit of establishing this connection of Kelsey to the homicide.

{¶68} Simmons maintains that the court's instruction did not cure the prejudice from Kelsey's remarks, and that it was too late to effectively cross-examine or impeach Kelsey on her remarks. We disagree. The record does not support Simmons's contention that the defense could not have chosen to change the trial strategy during Kelsey's testimony. And we presume that the jury followed the trial court's instruction with respect to the improper remarks.

{¶69} In light of the trial court's curative instruction, the trial court's decision to deny the mistrial motion based on Kelsey's improper reference to Simmons's incarceration exhibited a sound reasoning process and will not be disturbed. *See Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, at ¶ 92.

{¶70} *New Trial*. We also reject Simmons's claim that he should be awarded a new trial based on the combined effect of Kelsey's comments and Detective Wloszek's testimony implying that he had identified Simmons's cell-phone number through the "Regional Crime Information Center" database. The jury is presumed to have followed the court's instruction to disregard the part of Kelsey's response concerning Simmons's incarceration. And although the trial court did not issue a similar instruction regarding Detective Wloszek's reference to the "Regional Crime Information Center," we cannot say that this comment prejudiced Simmons to

the extent that he was denied a fair trial. We note that the comment was a vague and fleeting reference to prior bad acts, and that the jury was made aware that Simmons had prior convictions by his own stipulation to that fact, which established his disability for the weapons offense.

### *Prosecutorial Misconduct*

{¶**71**} Simmons also argues that prosecutorial misconduct denied him his constitutional right to due process and a fair trial, requiring a reversal of his convictions. In support of his argument, Simmons cites the prosecution's alleged elicitation of prior-bad-act testimony and the prosecutor's improper remarks in closing argument.

{¶**72**} Generally, prosecutorial misconduct will not provide a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the appellant of a fair trial. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchtone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 61, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Applying this standard, we find no merit to Simmons's claim.

{¶**73**} Although the record does reflect that Kelsey had twice referenced that Simmons had been incarcerated and that Wloszek had disclosed that he had performed a computer check on Simmons through the "Regional Crime Information Center," the record does not suggest in any way that the prosecutor had elicited this testimony. The prosecutor's questions were not facially designed to elicit the improper responses. Moreover, the record demonstrates that the prosecutor twice prevented the jury's further exposure to this information. He interrupted an additional response from Kelsey in which it appeared that she would again refer to Simmons's incarceration. Later, he interrupted himself from referring to Simmons's

incarceration when reading back to Kelsey a statement that she had made to the police that referenced Simmons's incarceration. And, the prosecutor agreed to restate the question that he had asked of Detective Wloszek to avoid any reference to the objectionable testimony and he did not return to that same line of questioning. We conclude, therefore, that Simmons has failed to demonstrate that the prosecutor acted improperly with respect to this testimony.

{¶74} Simmons claims also that misconduct took place during closing argument when the prosecutor repeatedly referred to him as the "offender." The test for prosecutorial misconduct in closing argument is whether the comments were improper and prejudicial to the accused's substantial rights. *State v. Williams*, 99 Ohio St.3d 439, 447, 2003-Ohio-4164, 793 N.E.2d 446, citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). In determining whether a prosecutor's remarks during closing argument were prejudicial, we must consider "the effect the misconduct had on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

{¶75} Simmons characterizes the prosecutor's use of the word "offender" as a repeated interjection of the prosecutor's opinion about the defendant's guilt. The state argues that the prosecutor's comments were not improper because Simmons, who stipulated to his prior conviction, was properly characterized as a convicted offender. The state also notes that Simmons failed to object to the prosecutor's reference to him as the offender, and therefore, a plain error standard of review applies. Plain error is one in which but for the error, the outcome of the trial clearly would have been different. *See, e.g., State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus.

{¶76} We reject the state's argument that the prosecutor's repeated reference to Simmons as the "offender" was proper and within the latitude allowed in summation due to Simmons's prior conviction. The prosecutor used the term

21

multiple times during the initial portion of closing argument to indicate that Simmons was one of the "offenders" who had participated in the murder of Thompson. For instance, the prosecutor stated that "[t]he [telephone numbers] are affiliated with different offenders" and that the "telephone records indicate * * * what kind of text messages are going on between each of these offenders."

{¶77} A prosecutor should not invade the jury's realm by rendering a personal belief regarding guilt. *Smith*, 14 Ohio St.3d at 14, 470 N.E.2d 883; *State v. Stephens*, 24 Ohio St.2d 76, 83, 263 N.E.2d 773 (1970). The prosecutor's use of the word "offender" may have insinuated his belief that Simmons was guilty and was not proper. But after considering these remarks in the context of the lengthy trial, the evidence presented at trial, and the trial court's general instruction that the arguments of counsel are not to be considered as evidence, we conclude that the prosecutor's remarks did not affect the outcome of the trial and rise to the level of plain error.

{¶78} In sum, because we hold that the trial court did not abuse its discretion by overruling Simmons's motions for a mistrial, and that Simmons received a fair trial notwithstanding the discovery violations, the witnesses' reference to other-act evidence, and the prosecutor's improper remarks in closing argument, we overrule the first and fifth assignments of errors.

### Failure to Record Sidebar Conferences

{¶79} In his fourth assignment of error, which we address next, Simmons contends that the trial court erred by failing to record sidebar conferences. As Simmons indicates, there were at least 36 unrecorded sidebar conferences in this case, which included the discussion of some of the motions for mistrial. During recesses, the trial court paraphrased the contents of these sidebar conferences in a "summary," generally covering the contents of two or three sidebars at a time, but sometimes as many as nine. After reciting this summary, the trial court allowed each

22

party to add or correct the summary. Defense counsel did not object to this procedure.

{¶80} This court has recently reiterated that Crim.R. 22 requires the recording of sidebar conferences in serious-offense cases, *State v. Davis*, 1st Dist. Hamilton No. C-130198, 2014-Ohio-794, ¶ 13, citing *State v. Brewer*, 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491 (1990), and *State v. Keenan*, 81 Ohio St.3d 133, 139, 689 N.E.2d 929 (1998), and that the trial court's summary of the sidebar conferences in lieu of a recording is error. *Davis* at ¶ 15.

{¶81} We also reiterated, however, that a defendant must show prejudice from the trial court's failure to record the sidebar conferences, especially where the defendant does not object to the procedure employed by the court. *Id.* To that end, the defendant bears the burden of reconstructing the unrecorded sidebar conferences, as provided in App.R. 9(C). *Id.* at ¶ 14.

{¶82} In this case, Simmons accepts the trial court's summaries as a substitute for an App.R. 9(C) statement. But he then takes a contradictory position and argues, without any support, that the summaries were not comprehensive and that as a result he was prejudiced.

{¶83} On this record, Simmons has demonstrated that the trial court erred by failing to record the sidebar conferences. But he has failed to demonstrate any prejudice from the trial court's failure to record the sidebar conferences, because he has not presented an App.R. 9(C) statement indicating information left out of the court's summaries that would benefit him in our review of the issues raised.

{¶84} Accordingly, the error was harmless, and we overrule the fourth assignment of error.

### Ineffective Assistance of Trial Counsel

{¶85} Simmons argues in his second assignment of error that he was deprived of his right to the effective assistance of trial counsel. In support of his

claim, Simmons points to defense counsel's failure (1) to object to Papke's cell-tower locator testimony, (2) to call a cell-site engineer as a witness, (3) to object to the prosecutor's references to Simmons as the "offender" during closing argument, (4) to renew the Crim.R. 29 motion for acquittal at the close of all evidence, and (5) to request that sidebars be recorded.

{¶86} To prevail on his claim that trial counsel was ineffective, Simmons must demonstrate that trial counsel's performance was both deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989).

{¶87} With respect to deficiency, Simmons must show that his counsel's performance "fell below an objective standard of reasonableness." *Strickland* at 688. Our scrutiny of defense counsel's performance must be highly deferential, as "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

{¶88} Counsel's failure to make objections is not, by itself, enough to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 168; *State v. Holloway*, 38 Ohio St.3d 239, 244, 527 N.E.2d 831 (1988).

{¶89} ***Paula Papke's Testimony***.   Simmons argues that trial counsel was ineffective for failing to object to testimony from the state's witness Paula Papke on the grounds that she was improperly testifying to hearsay evidence and was improperly testifying as an expert.

{¶90} The state called Cincinnati Bell employee Papke as custodian of Simmons's cell-phone records to lay the appropriate foundation for the admission of these records under the business-records exception to the hearsay rule.   These records included for each subscriber a report detailing for each communication (1)

24

the originating number, (2) the receiving number, (3) the type of communication, voice or text, and whether that communication connected, (4) the date and time of the communication, (5) the cell tower used by the subscriber, (6) the duration of the communication, (7) the serial number and international mobile subscriber identity assigned to the device, and (8) roaming information. Simmons's cell-phone records also included a separate report containing the content of his text messages, the cell-phone number of the originating and receiving parties, and the date and time of those messages.

{¶91} Simmons's cell-phone records were admitted under the business-record exception pursuant to Papke's testimony authenticating them. *See State v Hood*, 135 Ohio St.3d 137, 2012-Ohio-6208, 984 N.E.2d 1057. Simmons does not challenge the propriety of that determination on appeal.

{¶92} But the state also elicited testimony from Papke regarding the interpretation of those records in conjunction with cell-tower-location information. Papke explained that the signal from a cell phone is transmitted from a cell tower and that the "engineering office" at Cincinnati Bell had determined that the signal is typically transmitted from the tower closest to the person placing the communication.

{¶93} Using the cell-tower-location data from Simmons's communications and a map of the cell-tower locations, Papke attempted to locate Simmons and demonstrate that Simmons had travelled to Mt. Auburn during the time period preceding the shooting. When Simmons last communicated with Daniel about 15 minutes before the shooting, his cell-phone signal had pinged off cell-phone towers near Mulberry Street. Simmons then made and received communications from another cell-phone user, again pinging off cell-phone towers near Mulberry Street. Simmons's cell phone was not used during a 15 minute window, approximately the eight minutes before the shooting and the seven minutes after the shooting, and

therefore, did not ping off of any towers during this time. But when he used the cell phone after the shooting had taken place, his cell-phone signal had pinged off another cell-phone tower near Mulberry Street.

{¶94} Papke conceded, however, that based on her records, the signal from Simmons's cell phone had never pinged off cell-tower 475, the one closest to the scene of the shooting on Mulberry Street, and that she could not say that Simmons's cell phone had been on Mulberry Street that evening. And she admitted that in the time near the shooting his cell-phone signal pinged off of the cell tower that usually appeared in his cell-tower data records.

{¶95} Defense counsel did not object to Papke's cell-tower-locator testimony, which Simmons argues was inadmissible hearsay and inadmissible expert testimony. Defense counsel, however, did cross-examine Papke on this testimony as if she were an expert. Simmons argues that defense counsel's failure to object to this testimony was prejudicial because the state used it to attempt to place Simmons at the scene of the shooting.

{¶96} *Tactical Reasons to Not Object*. Simmons argues that defense counsel's performance was deficient for failure to object to the testimony that the cell-phone signal usually pings off of the closest cell tower, but we disagree. Even if this testimony was inadmissible on hearsay grounds, a question that we do not need to answer, defense counsel used Papke's cell-tower-locator testimony to emphasize that the state could not place Simmons on Mulberry Street before, during or after the shooting, because his cell phone did not ping off of the closest tower to that street.

{¶97} Moreover, the record demonstrates that defense counsel was familiar with Papke as an "expert witness" from other cases and was able to effectively cross-examine her. We conclude, therefore, that defense counsel did not object to Papke's testimony for tactical reasons.

{¶98} *Failure to Call a Defense Expert*. Simmons further attacks defense counsel's performance based on his failure to call a cell-site engineer as an expert witness. He recognizes that the failure to call an expert could be considered tactical, because an expert might uncover evidence that would further incriminate the defendant. Simmons claims, however, that risk was not present in this case because the cell-tower-locator evidence is "never reliable." But nothing in the record supports this bald assertion. "[P]ure[] speculation" is not sufficient to demonstrate an ineffective assistance of counsel claim. *See State v. Madrigal*, 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52 (2000).

{¶99} Further, as we have already discussed, Papke's testimony did not place Simmons on Mulberry Street at the time of the shooting. Defense counsel effectively cross-examined Papke as if she were an expert, exposing the weakness in her testimony. On the state of this record, Simmons has failed to overcome the strong presumption that counsel's failure to call an expert witness was a strategic decision. Thus, we conclude that defense counsel's performance was not deficient based on his failure to call an expert and to instead rely on the cross-examination of Papke. *See State v. Nicholas*, 66 Ohio St.3d 431, 436, 613 N.E.2d 225 (1993), citing *State v. Thompson*, 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407 (1987).

{¶100} *Failure to Demonstrate Prejudice*. Finally, even assuming that the advocacy of defense counsel was deficient, Simmons cannot show that he was prejudiced. We cannot say that but for this evidence, the result of the trial would have been different. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2051, 80 L.Ed.2d 674; *Bradley*, 42 Ohio St.3d at 141-142, 538 N.E.2d 373. Even if the cell-tower-locator evidence had been excluded, there was more than sufficient evidence from which the jury could have concluded that Simmons had committed the crimes at issue, including Daniel's testimony, the content and timing of Simmons's text messages to and from Daniel and Kelsey, Kelsey's testimony that Simmons had apologized for

shooting Thompson, and Coffey's testimony, which provided some corroboration of Daniel's testimony.

{¶101} *Other Alleged Ineffectiveness of Counsel*. Simmons also contends that counsel was deficient for failing to object to the prosecutor's six references to him as the "offender" during closing argument. But Simmons cannot demonstrate the requisite prejudice to establish his claim, because the record does not support a determination that but for these remarks, the result of the trial would have been different. *Strickland* at 687; *Bradley* at 141-142.

{¶102} Next, Simmons contends that he was deprived of his right to the effective assistance of counsel because counsel did not renew the Crim.R. 29 motion for acquittal at the close of all evidence. But any error in counsel's performance was not prejudicial where, as discussed more fully under the sixth assignment of error, the state presented sufficient evidence of each element of the offenses and thus, the motion would have been overruled.

{¶103} Finally, Simmons challenges counsel's performance on the ground that counsel failed to request that the trial court record all sidebar conferences. But Simmons cannot demonstrate prejudice from trial counsel's failure to object because he accepts the trial court's summary of the unrecorded proceedings and cannot show that had the conferences been recorded, the outcome of the trial would have been different.

{¶104} Simmons has failed to demonstrate that he was deprived of his right to the effective assistance of counsel at trial. Accordingly, we overrule the second assignment of error.

### Sufficiency and Manifest Weight of the Evidence

{¶105} In his sixth and seventh assignments of error, Simmons argues that his convictions for murder and having weapons under a disability were not supported by

sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶106} *Sufficiency of the Evidence*. In reviewing a record for sufficiency, we must determine whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the offense proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶107} Simmons argues that the state failed to prove that he was Thompson's shooter because no fingerprints or DNA connected him to the murder and no gun was recovered. He further contends that Daniel's testimony was unreliable and that evidence supported his theory that Kelsey's family had orchestrated Thompson's murder to avenge her. But the state charged Simmons as a principal or as a complicitor with respect to Thompson's murder and, therefore, the state was not required to prove that Simmons had actually pulled the trigger to convict him.

{¶108} Further, Simmons's codefendant, Daniel, was at the scene of the shooting and identified Simmons as the shooter. His testimony indicated that he and Simmons had carried out a plan to ambush Thompson, and that testimony was corroborated by the cell-phone records, which contained the content of the text messages and the timing of the text messages and cell-phone calls between him, Kelsey and Simmons. Kelsey testified that Simmons had implicitly admitted to her that he had shot Thompson when he apologized for what happened in the stairwell. Further, Simmons stipulated to the prior requisite conviction for the offense of having weapons under a disability.

{¶109} After viewing this evidence in the light most favorable to the state, we hold that the state provided sufficient evidence to support the convictions for murder and having weapons under a disability.

{¶110} *Weight of the Evidence*. In reviewing a challenge to the weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice such that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶111} Simmons was not able to diminish the evidentiary value of the cell-phone evidence that exposed the content of his text messages and his cell-phone call history and that corroborated Daniel's and Kelsey's testimony. We note that the credibility of the witnesses is primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. After our review of the record, we conclude that the jury did not lose its way and create a manifest miscarriage of justice in convicting Simmons of the offenses.

{¶112} Accordingly, we overrule the sixth and seventh assignments of error.

### *Sentencing*

{¶113} The trial court ordered Simmons to serve consecutively his indefinite term of life in prison for the murder and his three-year term for the weapons offense. In his third assignment of error, Simmons challenges the imposition of the consecutive terms on the ground that the trial court failed to make the findings required by R.C. 2929.14(C)(4).

{¶114} In Ohio, there is a statutory presumption in favor of concurrent sentences for most felony offenses. R.C. 2929.41(A). The trial court may overcome this presumption by making the statutory, enumerated findings set forth in R.C. 2929.14(C)(4). *State v. Bonnell*, Slip Opinion No. 2014-Ohio-3177, ¶ 23. This statute requires the trial court to undertake a three-part analysis. *State v. Alexander*, 1st Dist. Hamilton Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 15.

{¶115} To that end, the court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. *Id.* at ¶ 15. The court must also find that consecutive sentences are not disproportionate to the offender's conduct and to the danger the offender poses to the public. *Id.* Finally, the court must make at least one of three additional findings, which include that (a) the offender committed one or more of the offenses while awaiting trial or sentencing, while under a sanction imposed under R.C. 2929.16, 2929.17, or 2929.18, or while under postrelease control for a prior offense; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the seriousness of the offender's conduct; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *Id.*, citing R.C. 2929.14(C)(4).

{¶116} The trial court is not required to articulate reasons to support its findings, *Bonnell* at syllabus, or "to give a talismanic incantation of the words of the statute." Id. at ¶ 37. However, the record must be sufficient for a reviewing court to determine that the court has engaged in the required sentencing analysis and has made the findings required by the statute. *Id.* at ¶ 36; *Alexander* at ¶ 16.

{¶117} In *Bonnell*, the Ohio Supreme Court clarified *where* the trial court must make the R.C. 2929.14(C)(4) findings. A trial court must announce the requisite consecutive findings at the sentencing hearing, and the court must incorporate those findings into the sentencing entry. *Bonnell,* 2014-Ohio-3177, at syllabus. The sentencing entry is the document contemplated by Crim.R. 32(C). *See id.* at ¶ 29-31; *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163, ¶ 17, *modified in part on other grounds, State v. Lester*, 130 Ohio St.3d 303, 2011-Ohio-5204, 958 N.E.2d 142.

{¶118} This court previously held in *Alexander* that the trial court's inclusion of the consecutive-sentence findings in a sentencing worksheet, standing alone, was sufficient to comply with the legal requirements. We note that *Bonnell* has sub silentio overruled this portion of *Alexander*.

{¶119} Simmons argues that the trial court's decision to impose consecutive sentences was both contrary to law and an abuse of discretion. But we no longer employ an abuse of discretion standard when reviewing sentences. *See, e.g., State v. White*, 2013-Ohio-4225, 997 N.E.2d 629 (1st Dist.). Instead, this court employs the standard of review set forth in R.C. 2953.08(G), which provides that a reviewing court may vacate consecutive sentences only if "it clearly and convincingly finds" that (1) the record does not support the trial court's R.C. 2929.14(C)(4) sentencing findings or (2) the sentence is otherwise contrary to law. *Bonnell* at ¶ 28. The trial court's imposition of consecutive terms of imprisonment without making the requisite findings at the sentencing hearing renders the sentence clearly and convincingly contrary to law and, as a result, the sentence must be vacated and the cause remanded to the trial court for resentencing. *Bonnell* at ¶ 37.

{¶120} In this case, at the sentencing hearing, the trial court made findings that duplicated the language set forth in subdivisions (b) and (c) of R.C. 2929.14(C)(4), but the court skipped the initial two steps of the statutory analysis, and failed to make all of the findings required by the statute. The trial court also failed to incorporate any of the necessary findings into its judgment entry. We note that if the trial court had failed only to incorporate the statutorily mandated findings made at the sentencing hearing into the sentencing entry, then that clerical mistake could be corrected by a nunc pro tunc entry. *Bonnell*, 2014-Ohio-3177, at ¶ 30.

{¶121} Because the record does not demonstrate that the trial court engaged in the required analysis and selected the appropriate statutory criteria before ordering sentences to be served consecutively, the sentence imposing consecutive

terms of imprisonment is clearly and convincingly contrary to law and must be vacated. *Bonnell* at ¶ 37.

{¶122} Accordingly, we sustain the third assignment of error.

### *Conclusion*

{¶123} We affirm the trial court's findings of guilt. But because the trial court failed to make the requisite findings for consecutive sentences and to incorporate those findings into its judgment entry, we vacate the sentences and remand the cause to the trial court for resentencing.

Judgment accordingly.

**HILDEBRANDT** and **HENDON, JJ.,** concur.


Please note:

The court has recorded its own entry on the date of the release of this opinion.