[Cite as *State v. Bailey*, 2015-Ohio-2997.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-140129 |
| | | TRIAL NO. B-1303410 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| HARRY BAILEY, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: July 29, 2015

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Scott Heenan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michaela Stagnaro,* for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

**CUNNINGHAM, Judge.**

{¶1} Defendant-appellant Harry Bailey appeals from the judgment of the Hamilton County Court of Common Pleas convicting him of burglary, felonious assault, and robbery. In five assignments of error, he contends that the admission of hearsay evidence concerning the victim's identification of him was plain error, that he was denied a fair trial due to prosecutorial misconduct and the ineffective assistance of trial counsel, that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, and that his sentences were contrary to law, because the trial court did not merge the sentences and it imposed maximum, consecutive terms. For the reasons that follow, we affirm.

## I. Background Facts and Procedure

{¶2} Shawntelle Miller was brutally attacked in her apartment during the early morning hours on May 25, 2013. She had let her intruder into her apartment after he had knocked on her door. After his entry, he strangled Miller with her scarf, punched her in the face, and stabbed her in the neck with a butter knife. He took the $80 found in Miller's purse and threw the purse to the floor.

{¶3} At the time of the attack, Miller was almost 40 years old, had lived independently in the apartment for about four months, and had a job. But she was mentally disabled and had the intellectual capacity of an eight-to-ten-year-old child. Bailey and his girlfriend lived across the hall from Miller on the ground floor of the two-story building. Tiffany Capps lived catty-corner to Miller, in the only other apartment unit on the ground floor, which also contained a small laundry room.

{¶4} The three neighbors knew each other, at least in passing, and had discussed petitioning the building manager to improve the conditions in the apartment a few weeks before Miller's attack. And on the night of the attack, Bailey and Miller had earlier greeted each other in the hallway of the apartment building.

2

{¶5}    After the attack, which occurred between 1:00 a.m. and 4:30 a.m., Miller called her father, Herman Lewis, who lived down the street from Miller. Lewis had last seen her around 12:30 a.m., when he had left her at her apartment. Although Miller was not able to reach her father when she first called, when he returned her phone call, she told him, in a soft voice, that she needed some ice for her sore throat.

{¶6}    Lewis went to Miller's apartment and found her battered and bleeding. She was in significant pain, in a daze, and about to faint. Her apartment was in disarray, with her purse thrown to the floor in her bedroom. Lewis observed a blood-soaked scarf strewn on the floor of the living room, and later found a bloodied butter knife in the kitchen.

{¶7}    *Victim's out-of-court identification of her assailant.* Lewis asked, "What happened?" and Miller told him that her "neighbor" had attacked her. Lewis took her to his home and summoned the police and an ambulance. Officer Derek Johnson from the Cincinnati Police Department arrived at about 9:30 a.m. and asked Miller what had happened. According to Officer Johnson, Miller had difficulty speaking due to her pain and was coughing up blood. Lewis told him that Miller had told him that her "next door neighbor" had caused her injuries.

{¶8}    Miller was subsequently taken to the hospital, where she repeatedly informed the emergency staff that her "mean neighbor" had assaulted her. When Miller left for the hospital, Lewis took Officer Johnson into Miller's apartment, where Officer Johnson took photographs. While they waited for investigators, Bailey pulled up to the building in a black car. A relative informed Officer Johnson that Bailey was in the car. Officer Johnson detained Bailey in his police vehicle and asked him if anything had happened between him and the resident in Miller's unit. He did not reveal the details of the attack. Bailey said no and exited from Johnson's vehicle.

3

{¶9} Officer Johnson then obtained a photograph of Bailey and showed it to Miller at the hospital. Although she was hesitant to look at it, when she finally looked at it, she said, "That's him."

{¶10} Although Johnson took photographs of Miller's apartment, the crime scene was not processed that morning due to the investigator's belief that the police needed written consent from Miller and a subsequent miscommunication between Officer Johnson and the investigator. When Lewis returned to Miller's apartment the following day, the bloodied knife and scarf were missing. He realized too that Miller's keys, which she had before the attack, were also missing. And Lewis did not see Bailey or his black car on the grounds of the apartment building.

{¶11} Detective Regina Williams visited Miller in the hospital on May 29. Miller was not able to speak because a tracheotomy tube installed on May 26 was still in place. Although Miller was not able to speak, she nodded affirmatively when Detective Williams showed her a photograph of Bailey and asked if he was the neighbor who attacked her. Detective Williams returned the following day after the tube had been removed. In a whisper, Miller stated that her neighbor had come over and that he had beat her.

{¶12} On May 31, Detective Williams knocked on Bailey's door. A woman who introduced herself as Bailey's girlfriend answered. Detective Williams learned Bailey was not there and all of his belongings were gone. Bailey's girlfriend told Detective Williams that Bailey had gone to Dayton for a job.

{¶13} Also on May 31, Detective Williams spoke with Bailey's and Miller's neighbor, Capps. Capps told Detective Williams that she had heard loud noises coming from the hallway outside of her door in the early morning of May 25 and that she specifically recalled hearing the word "money" spoken. Capps gave Detective Williams a piece of duct tape that she had recently found covering the peephole on her apartment door. Bailey's DNA was found on the tape.

{¶14} *Bailey's interview.* Bailey contacted Detective Williams and offered to appear for an interview on June 5. During the interview, Detective Williams's partner Detective Longworth told Bailey that he had been identified as someone involved in an "incident involving Shawntelle Miller." Bailey denied any involvement in a physical or verbal altercation with Miller.

{¶15} Bailey told the detective that on the evening of May 24, his sister and her family had driven down from Dayton to visit him and his girlfriend. They left around 1:10 a.m. on May 25. He then went to sleep until he arose to drive his girlfriend to her job in Northern Kentucky at 4:30 a.m. When he returned to his apartment several hours later, he was told that his neighbor had been "beaten up," and the police questioned him about the incident. Bailey told the detective that he then moved to Dayton for a job, but he decided to return to Cincinnati after learning from his girlfriend that the police were looking for him.

{¶16} During the interview, Detective Williams explained that the perpetrator had grabbed the victim's scarf, and he asked Bailey how his DNA would be on the scarf if he had not been involved. Bailey said that he might have touched it in the apartment building's laundry room when he was doing laundry, but that "I ain't wrap it around her fuckin' neck, I know that." No one, however, had told Bailey that Miller's assailant had used the scarf in that manner.

{¶17} *The trial.* Bailey was subsequently arrested and charged with burglary, robbery, and two counts of felonious assault. At trial, Miller testified that "Harry Bailey" had been in her apartment. When asked if she saw him in the courtroom, Miller said "no" and that she did not want to look at him. The prosecutor then asked if she could show her a photograph instead. Miller replied, "Yes." She then handed Miller a photograph of Bailey and asked Miller if she recognized the photograph. Miller replied affirmatively. The prosecutor asked her who had shown her the

photograph. Miller mentioned "Miss Williams," "Holly," and, with the prosecutor's assistance, "Officer Johnson."

{¶18} Miller then identified the person in the photograph as "Harry Bailey." Although her testimony did not relay the events of her attack in a chronological order, she indicated that Bailey had choked her with her scarf inside her apartment, that he had knocked on her door and she had let him in, and that he had taken money from her purse and had thrown the purse to the floor. She also indicated, both verbally and with her hands, how Bailey had punched her in the face, causing two black eyes that swelled shut, and how he had stabbed her in the neck with a butter knife. Miller claimed that she had not fought back and she had thought Bailey was going to kill her, but he left. She said he knocked on her door again later and threatened to kill her. She did not let him in, and he went away.

{¶19} On several occasions during her testimony, Miller said that she did not want to look at "him," meaning Bailey. And she was adamant that she was too scared to go back to her apartment.

{¶20} Miller's father Lewis and Holly Mott, a specially trained investigative agent employed by the Hamilton County Development Disabilities Services, testified before Miller. Lewis testified and described how he had found his daughter and the emotional shock that she was in. He said that she had identified her assailant as her "neighbor," and she had refused to return to her apartment after the attack.

{¶21} Lewis also explained that despite her mental disability, Miller was able to recall and describe past events, but that she did not always describe the events in order from start to finish. This testimony was echoed by Mott, who stated that it was not uncommon for a person with developmental disabilities to provide a nonchronological but otherwise accurate recollection of events.

{¶22} Mott explained that she had been assigned on June 3 to assist Miller, including accompanying her during the legal proceedings. Mott testified that Miller

had appeared in court whenever required and that she had been consistent in her recollection of events, including identifying Bailey as her attacker.

{¶23} Mott acknowledged, however, that Miller could have been led to a certain result if not interviewed properly and that Bailey had already been identified as Miller's assailant before she was able to interview Miller using her special training.

{¶24} Officer Johnson and Detective Williams both testified to what Miller had told them about the attack and her attacker, and what Miller's father had told them Miller had said about the attack and her attacker. Defense counsel did not object on hearsay grounds except when the testimony involved the theft of money from Miller's apartment.

{¶25} Bailey's interview with the police was played for the jury, including his statement showing knowledge that Miller had been choked with her scarf. And Miller's medical records, indicating that she had told the emergency staff at the hospital that she had been attacked by her neighbor, were admitted into evidence. These records also confirmed that Miller had been stabbed, beaten, and choked.

{¶26} Finally, Capps testified at trial and identified the duct tape containing Bailey's DNA that she had found covering the peephole on her apartment door a few days after Miller's attack. Capps also informed the jury that she had heard a commotion about "money" in the hallway of her apartment building around the time of Miller's attack.

{¶27} Bailey's girlfriend, sister, and brother-in-law testified in support of his alibi defense. His girlfriend claimed that Bailey was asleep next to her in their apartment at the time of the attack. She testified, however, contrary to Bailey's statement to the police that he used the laundry facilities at the apartment building, that Bailey had never used the laundry facilities at the apartment building. Further, she testified that Bailey had moved to Dayton after the attack to be with his sick sister, but on cross-examination acknowledged that she had told Detective Williams

that Bailey had moved to Dayton for a job. And she testified that Bailey had financial difficulties, which furthered the state's theory that Bailey's initial motive for the crimes was to take Miller's money.

{¶28}  Bailey's sister Rhonda and her boyfriend Ron Jackson both confirmed that they had been with Bailey until about 1:00 a.m on the night of the attack. But Rhonda testified that Bailey had visited her in Dayton after Miller's attack because she was ill due to a heart issue. Conversely, Jackson testified that Bailey had gone to Dayton because he had been accused of "jump[ing]" a girl.

{¶29}  Based on this evidence, the jury found Bailey guilty on one count of burglary, one count of robbery, and two counts of felonious assault. The trial court subsequently merged the felonious-assault counts, and sentenced Bailey to maximum, consecutive sentences for the three offenses. This appeal followed.

## II. Analysis

### A. Admission of Hearsay Evidence

{¶30}  Bailey's first assignment of error involves the testimony by Lewis, Mott, Officer Johnson, and Detective Williams about what Miller told them concerning the attack, and testimony by Mott, Officer Johnson and Detective Williams about what Lewis said his daughter had told him concerning her attack. Bailey argues that these statements were inadmissible hearsay, and that they were improperly used to bolster Miller's testimony at trial identifying him as her assailant. But Bailey acknowledges that defense counsel failed to object to the admission of this testimony.

{¶31}  Bailey contends that even though defense counsel did not object to the admission of this testimony, the evidence should be deemed inadmissible under the plain-error doctrine. *See* Crim.R. 52(B). Plain error is an error so extreme that it affected the outcome of the proceedings and must be corrected to prevent a manifest

miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraphs two and three of the syllabus.

{¶**32**} *Excited-utterance exception.* The state first argues that some of the statements were not hearsay because they were excited utterances. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2).

{¶**33**} We agree with the state that Miller's first statements to her father concerning the attack were made under the stress of excitement caused by the attack, which could only be described as startling. It is not clear from the record exactly how much time had lapsed after the attack before Lewis first spoke to his daughter in her blood strewn and ransacked apartment. But it was within several hours of the attack, and it was clear that Miller, who was in significant pain, in a daze and about to faint, was still under the stress of the particularly brutal and terrifying attack when she made her excited utterances to Lewis. Moreover, we do not find that Lewis's general question of "what happened?" to his daughter upon seeing the crime scene was a "coercive" or "leading" type of questioning such that it " 'destroy[ed] the domination of the nervous excitement over [Miller's] reflective faculties.' " *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 170, quoting *State v. Wallace*, 37 Ohio St.3d 87, 90-91, 524 N.E.2d 466 (1988), paragraph two of the syllabus. Instead, it facilitated Miller's expression of her thoughts. *Id.*

{¶**34**} Thus, Miller's first statements to her father describing her physical attack and theft, and identifying her "neighbor" as her assailant, were admissible as excited utterances under Evid.R. 803(2) and were, therefore, properly admitted into evidence.

{¶**35**} *Deliberate failure to object as a legitimate trial strategy.* But not all of the challenged statements would have qualified as excited utterances.

Nonetheless, the state argues, and we agree, that Bailey cannot demonstrate plain error. Plain error may not be invoked to exclude allegedly prejudicial hearsay testimony to which defense counsel did not object when the record demonstrates that counsel's failure to object was deliberate and in furtherance of legitimate trial tactics. *See State v. Wolery*, 46 Ohio St.2d 316, 348 N.E.2d 351 (1976), paragraph three of the syllabus.

{¶36} Bailey primarily takes issue with statements involving Miller's identification of him as her assailant. By allowing this evidence at trial, defense counsel could argue that Miller was led to believe that Bailey had attacked her by those who had conversations with her, beginning with her conversation with her father. Defense counsel was more concerned with what Miller *did not say* during her conversations with her father and the other state's witnesses because she did not name Bailey.

{¶37} As her father testified, Miller had identified her attacker only as her "neighbor." But Officer Johnson testified that Lewis had told him that his daughter had said that it was the "next door neighbor." Officer Johnson then showed Miller the photograph of only one person—Harry Bailey, and presumably that is when she learned his name. On cross-examination, Mott testified that Miller could be easily led if not interviewed according to the methods for which Mott had received special training. Therefore, Bailey argued that Miller's testimony at trial unequivocally naming "Harry Bailey" as her attacker was unreliable.

{¶38} This trial strategy was evident in voir dire when defense counsel asked the potential jurors, "Have you ever known someone who had a passionate belief that something, some event or something happened a certain way, maybe concerning their child, but then it turned out they were wrong?" The strategy became more evident during closing argument when defense counsel argued that Miller was misled into identifying Bailey as the perpetrator. To that end, defense counsel argued that

the police did not properly interrogate Miller about what happened and improperly showed her only Bailey's photograph. Defense counsel contended that "everyone jumped to the conclusion that it was [Bailey]" and that Miller consistently mentioned his name because she had "been told that name repeatedly for the last six months."

{¶39} The record further demonstrates that defense counsel objected to other hearsay evidence. Relevant here, as soon as the hearsay testimony moved from identifying Bailey and to an explanation of his motive, defense counsel objected. Thus, the failure to object appears to have been deliberate and in furtherance of a legitimate trial strategy to expose a significant weakness in the state's case.

{¶40} Because defense counsel deliberately failed to object to this testimony as a legitimate trial tactic, Bailey may not invoke the plain-error doctrine to exclude this allegedly prejudicial but unobjected to testimony. Accordingly, we overrule the first assignment of error.

### B. Prosecutorial Misconduct

{¶41} In his second assignment of error, Bailey argues that he was denied a fair trial by prosecutorial misconduct during closing argument. He argues that the prosecutor commented on evidence not presented at trial and improperly bolstered Miller's testimony by saying that all the evidence corroborated her testimony. Bailey did not object to any of these allegedly improper comments, and therefore, we review only for plain error.

{¶42} In determining whether prosecutorial misconduct has occurred, the test is whether the prosecutor's remarks were improper, "and if so, whether they prejudicially affected the accused's substantial rights." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 200; *State v. Slagle*, 65 Ohio St.3d 597, 607, 605 N.E.2d 916 (1992). We consider the closing argument in its entirety when determining whether it prejudiced the defendant. *Slagle* at 607.

**{¶43}** A prosecutor is entitled to a degree of latitude in closing argument "as to what the evidence has shown and what inferences can be drawn" from that evidence. *State v. Richey*, 64 Ohio St.3d 353, 362, 595 N.E.2d 915 (1992). "[But] it is improper for [the] prosecutor[] to incite the jurors' emotions through insinuations and assertions that are not supported by the evidence and that are therefore 'calculated to mislead the jury.' " *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 87, quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶44}** *Challenged comments were not improper.* We find no impropriety associated with the following challenged remarks of the prosecutor: (1) that Bailey had put tape over the neighbor's peephole to prevent the neighbor from witnessing the crime, (2) that Miller's blood was all over her apartment, and (3) that "everything in this case corroborate[d]" Miller's testimony. These comments were based on the evidence and within the latitude afforded the prosecutor in closing argument. *Richey* at 362.

**{¶45}** The prosecutor's comment that Miller "came [to court] every single time" to prosecute the case was also proper. The prosecutor made this remark in the context of explaining that Bailey may have chosen Miller as his victim because he thought that she would never tell the police and prosecute the crime. Bailey argues that the comment was not based on the evidence, but the record demonstrates otherwise. Mott testified that she had assisted Miller during the proceedings and that Miller had appeared at court whenever she was required to do so.

**{¶46}** We conclude that Bailey has not demonstrated error, much less plain error. Accordingly, we overrule the second assignment of error.

### C. Ineffective Assistance of Trial Counsel

**{¶47}** In his third assignment of error, Bailey argues that he was denied the effective assistance of trial counsel in violation of his constitutional rights. He

contends that this ineffectiveness was demonstrated by counsel's failure to object to the prosecutor's allegedly improper comments during closing argument, to object to the admission of Miller's hearsay statements, and to move to suppress Miller's out-of-court identification of Bailey as her assailant.

{¶48} To prevail on his claim of ineffective assistance of trial counsel, Bailey must show that trial counsel's performance was deficient and that this deficient performance prejudiced his defense such that he was denied a fair trial. *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1985), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶49} *Counsel's performance was not deficient.* In our discussion of Bailey's second assignment of error, we found no merit to Bailey's claim that the prosecutor's remarks during closing argument were improper. Thus, trial counsel was not ineffective for failing to object to the challenged remarks.

{¶50} Likewise, in our discussion of the first assignment of error, we held that Miller's initial statements to her father about the altercation qualified as excited utterances and, therefore, were properly admitted. Thus, trial counsel was not ineffective for failing to object to Lewis's testimony concerning those statements. We also held that trial counsel's failure to object to the other hearsay statements that included Miller's identification of Bailey was a part of a trial strategy. This court will not find ineffective assistance when counsel's failure to object to evidence was part of a reasonably sound trial strategy that falls "within the wide range of professionally competent assistance." *State v. Trusty*, 1st Dist. Hamilton Nos. C-120378 and C-120386, 2013-Ohio-3548, ¶ 65.

{¶51} In this case, the now challenged statements provided the foundation for Bailey's argument that Miller had been misled into identifying him as her assailant. Allowing this testimony was a valid trial strategy designed to try to

discredit Miller's identification of Bailey as the person who attacked her. As such, it cannot serve as the basis for an ineffective-assistance-of-counsel claim.

{¶52} Bailey also argues that trial counsel should have moved to suppress Miller's out-of-court identification of him after she was shown his photograph. He does not present any legal analysis showing that such a motion would have been successful, and merely characterizes the process used as highly suggestive under the circumstances. Moreover, he fails to consider that the suppression of that evidence would have foreclosed his defense that Miller, who unequivocally identified "Harry Bailey" as her assailant at trial, was misled into identifying him.

{¶53} In sum, Bailey has failed to demonstrate that he was denied the effective assistance of trial counsel. Accordingly, we overrule the third assignment of error.

### D. Sufficiency and Weight of the Evidence

{¶54} In his fourth assignment of error, Bailey argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence. Bailey was convicted of burglary in violation of R.C. 2911.12(A)(2), felonious assault in violation of R.C. 2903.11(A)(1), and robbery in violation of R.C. 2911.02(A)(2).

{¶55} In a challenge to the sufficiency of the evidence to support a criminal conviction, the test is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Our review of the evidence demonstrates that the state met its burden with respect to each offense.

{¶56} *Sufficiency standard met.* According to Bailey, the state failed to prove that he was the perpetrator of the offenses against Miller because neither his DNA nor his fingerprints were found inside Miller's apartment. But the state was not

required to have that type of evidence to prove beyond a reasonable doubt that he had committed the offenses. Miller identified him as her assailant, both in and out of court. And while Bailey denied committing the offenses during his police interview, the evidence demonstrates that he had knowledge of a crime detail that had not been disclosed to him—that Miller had been choked with her scarf. Bailey's knowledge of this detail was strong circumstantial evidence of guilt. Finally, Bailey's DNA was found on the tape that had been placed over the peephole on the door of Capps, the only other first floor tenant in Miller's building. The evidence was more than sufficient.

{¶57} Bailey also specifically contends that the state failed to prove all the elements of the robbery offense. He argues that there was no evidence that money was actually taken from Miller. But Miller testified that at the time of her attack she had had $80 in the wallet in her purse, and she agreed with the prosecutor that Bailey had not had her permission to take it. Further, she testified that Bailey had put her purse on the floor in her bedroom, as depicted on the crime scene photographs admitted at trial. Further, her father testified he gave Miller $300 in cash every month that she would keep in her apartment before spending it.

{¶58} Moreover, to prove robbery in violation of R.C. 2911.02, the state was not required to show that Bailey had actually taken property, only that he had attempted to do so. When viewing these facts in a light most favorable to the state, as we are required to do, we hold that that state met its burden of proof.

{¶59} *The jury did not lose its way.* Bailey's argument that his convictions are against the manifest weight of the evidence is also meritless. In reviewing a weight-of-the-evidence claim, this court must review "the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction

15

must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶60} Bailey argues that Miller's credibility was lacking due to her mental retardation, which he claims prevented her from recounting what had happened to her. But the evidence demonstrated that Miller held a job and lived on her own. Her father and Mott testified that Miller had the ability to recount what had happened to her. And the evidence at the scene corroborated her testimony, as did Bailey's statement to the police that suggested that he had wrapped Miller's scarf around her neck when attacking her. Moreover, Miller's identification of Bailey as her assailant remained consistent, even upon cross-examination.

{¶61} Bailey also argues that Miller's out-of-court identification of him was based on a suggestive procedure and that the taint of that out-of-court identification renders her in-court identification unreliable. But the jury heard the testimony concerning Miller's out-of-court identification of Bailey, including her reaction to his photograph, and they were able to observe Miller's fearful reaction to seeing Bailey and her identification of him as her assailant in court. The transcription of this confrontation at trial lends weight to Miller's identification of Bailey as her assailant.

{¶62} In support of his claim that the jury lost its way, Bailey points to the evidence that he presented. He claims that the testimony from his family members and girlfriend demonstrates that he could not have committed the offense. But Bailey's out-of-town guests admitted that they had departed from Bailey's apartment by 1:30 a.m. Although Bailey's girlfriend testified that he was with her from about 1:00 a.m. until 4:30 a.m., she also testified that she was sleeping. Moreover, her testimony contradicted several statements that Bailey had made to the police during his interview on issues such as their use of the laundry room in the apartment

building and why Bailey left town after the commission of the offenses. As a result, his argument is not compelling.

**{¶63}** We note that the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus, cited in *Trusty*, 1st Dist. Hamilton Nos. C-120378 and C-120386, 2013-Ohio-3548, at ¶ 74. This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *See id.*

**{¶64}** Because Bailey's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence, we overrule the fourth assignment of error.

### E. Sentencing Issues

**{¶65}** In his final assignment of error, Bailey challenges his sentences for burglary, felonious assault, and robbery, all second-degree felonies. The trial court imposed an eight-year prison term for each offense, the maximum term allowed by law. *See* R.C. 2929.14(A)(2). The trial court informed Bailey at the sentencing hearing that the terms shall be served consecutively, although the sentencing entry does not reflect that the court imposed consecutive terms. The sentencing entry also lacks the subsection of the felonious-assault statute that Bailey violated.

### 1. Maximum and Consecutive Terms

**{¶66}** Bailey argues that the trial court's imposition of consecutive, maximum terms of incarceration was contrary to law because the court failed to consider the principles and purposes of sentencing and to make the findings required by R.C. 2929.14(C)(4) to support consecutive terms.

**{¶67}** Under R.C. 2953.08(G)(2), we may modify or vacate Bailey's sentence only if we clearly and convincingly find that the record does not support the

mandatory sentencing findings, if any, or that the sentence is otherwise contrary to law. *See State v. White*, 2013-Ohio-4225, 997 N.E.2d 629, ¶ 11 (1st Dist.).

{¶68} *Consideration of the relevant sentencing factors.* The trial court must consider the purposes and principles of sentencing before imposing sentence, in accordance with the sentencing statutes, including R.C. 2929.11 and 2929.12. But we will presume that the court considered these statutes, even from a silent record, unless the appellant can demonstrate affirmatively that the court failed to do so. *See State v. Alexander*, 1st Dist. Hamilton Nos. C-110828 and C-110829, 2012-Ohio-3349, ¶ 24, *overruled sub silentio in part on other grounds*, *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.2d 659, as noted in *State v. Simmons*, 1st Dist. Hamilton No. C-130126, 2014-Ohio-3695, ¶ 118.

{¶69} Here, it is clear from the trial court's remarks at the sentencing hearing that it considered the relevant provisions of R.C. 2929.11 and 2929.12 in fashioning Bailey's sentence. The court's consideration of these provisions is also evinced by the trial court's use of sentencing-findings worksheets, which it journalized. The court noted Bailey's record of prior felony offenses, including aggravated robbery and attempted abduction, and that he was on postrelease control at the time of the offenses. The court also emphasized that Miller's serious physical and mental injuries were exacerbated by her mental disability. And the court observed that Bailey showed no remorse and appeared proud of his criminal conduct.

{¶70} *Imposition of consecutive terms.* We also conclude that the court's imposition of consecutive terms was not contrary to law. Before imposing consecutive terms, the trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry. *Bonnell* at syllabus. The trial court's failure to incorporate the statutory findings into the sentencing entry does not render the sentence contrary to law and may be corrected through a nunc pro tunc entry. *Id.* at ¶ 30.

{¶71} In this case, the trial court selected the appropriate statutory criteria for imposing consecutive terms and informed Bailey of these R.C. 2929.14(C)(4) findings at the sentencing hearing. The court found that the imposition of consecutive terms was necessary to protect the public and to punish Bailey, and that consecutive terms were not disproportionate to the seriousness of Bailey's conduct and the danger he poses to the public. The court then found that all three factors set forth in R.C. 2929.14(a)-(c) applied. The court entered these findings on the sentencing-findings worksheets. Thus, Bailey has not demonstrated that his sentence was contrary to law based on the trial court's failure to make the findings required by R.C. 2929.14(C)(4).

{¶72} The court failed, however, to incorporate the R.C. 2929.14(C)(4) findings into the sentencing entry. *See State v. Thomas,* 1st Dist. Hamilton No. C-140070, 2014-Ohio-3833, ¶ 9. This clerical mistake must be corrected on remand, in accordance with Crim.R. 36, along with the trial court's omission from the sentencing entry of its imposition of consecutive terms and the subsection of the felonious-assault statute that Bailey violated.

### 2. Merger of Offenses

{¶73} Finally, Bailey contends that the trial court erred by failing to merge his convictions under R.C. 2941.25, Ohio's merger statute. According to Bailey, the offenses were allied offenses of similar import, committed neither separately nor with a separate animus, and therefore, his three separate convictions must be merged into one. We review the trial court's merger ruling de novo. *See State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

{¶74} *The merger statute.* Essentially, under R.C. 2941.25, the merger of allied offenses occurs when the conduct of the defendant can be construed to constitute two or more allied offenses of a similar import, and this conduct shows that the offenses were not committed separately or with a separate animus.

19

{¶75} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court changed the standard for evaluating when allied offenses are subject to merger under the statute by overruling, in part, *State v. Rance*, 85 Ohio St.3d 632, 710 N.E.2d 699 (1999). The test in *Rance* to determine merger called for the court to first compare the statutory elements "solely in the abstract." *Johnson* at ¶ 44. Under *Johnson*, in determining whether allied offenses are subject to merger for purposes of R.C. 2941.25, courts must "consider the offenses at issue in light of the defendant's conduct," *id.* at ¶ 46, but are no longer to undertake "any hypothetical or abstract comparison of the offenses at issue." *Id.* at ¶ 47.

{¶76} *The Ruff test.* The Supreme Court, in *State v. Ruff*, ____ Ohio St.3d ____, 2015-Ohio-995, ____ N.E.3d ____, clarified the *Johnson* test by stating that R.C. 2941.25 contemplates an evaluation of "three separate factors—the conduct, the animus, and the import." *Ruff* at paragraph one of the syllabus. Separate convictions are permitted under R.C. 2941.25 for allied offenses if we answer affirmatively to just one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with a separate animus or motivation? *Id.* at paragraph three of the syllabus.

{¶77} As explained in *Ruff,* offenses are of dissimilar import "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Id.* at paragraph two of the syllabus.

{¶78} Because the Supreme Court decided *Ruff* after the parties submitted the briefs in this case, we requested, and received, supplemental briefing on this issue.

**{¶79}** *Bailey's merger argument.* Bailey maintains that the three offenses merge into one conviction because the allegations, as presented by the state, were that he entered Miller's apartment for the purpose of taking her money, he took the money, and he caused her serious physical harm in the process. According to Bailey, to convict him of the burglary offense, the state had to prove that he had purpose to commit a criminal offense, which in this case was robbery. His conduct in committing the burglary was for the purpose of committing the robbery, and therefore, the harm that resulted from the burglary and robbery offenses was not separate and identifiable, but similar in significance. Thus, he contends that they were similar in import, and the answer to the first question of the *Ruff* tripart test is "no."

**{¶80}** He contends that the answers to the second and third questions when comparing the burglary and robbery offenses are "no," too, because those offenses were not committed separately or with a separate animus or motivation. Thus, the burglary and robbery offenses merge.

**{¶81}** Similarly, he argues that the robbery and felonious-assault offenses merge. According to Bailey, the harm that resulted from each offense was not separate and identifiable, as the physical harm relied upon by the state to prove the robbery was the physical harm that established the felonious assault. Moreover, the offenses were not committed separately or with a separate animus, so the answer to all three questions of the *Ruff* test is "no."

**{¶82}** *The elements of the offenses.* Before applying the test for merger of offenses, we clarify that in applying the *Ruff* test, we are looking at the conduct of the defendant in the context of the statutory elements. The relevant burglary statute, R.C. 2911.12(A)(2), provides that "No person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the

21

habitation any criminal offense." The relevant felonious-assault statute, R.C. 2903.11(A)(1), provides that "No person shall knowingly * * * [c]ause serious physical harm to another." And the relevant robbery statute, R.C. 2911.02(A)(2) provides that "No person in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, attempt to inflict, or threaten to inflict physical harm on another."

{¶83} Further, neither the *Ruff* court nor the language of R.C. 2941.25 mandates the order of our inquiry. Thus, we may begin our analysis with any of the three questions. And we may end our analysis upon an affirmative response to any of the three questions.

{¶84} *Burglary and robbery offenses.* We first review Bailey's contention that the burglary and robbery offenses merge. At the outset, we disagree with his argument that the offenses were of a similar import; the commission of the offenses resulted in separate and identifiable harms. Bailey physically harmed Miller when he committed the robbery offense. This physical harm had significance apart from the harm inflicted when he trespassed in her apartment, by deceiving her, with the intent to deprive her of her property. Thus, the burglary and robbery offenses were of a dissimilar import, and the merger of those offenses was not appropriate.

{¶85} *Robbery and felonious-assault offenses.* We now turn to Bailey's argument that the robbery and the felonious-assault offenses merge. In response to his argument, the state contends that those offenses will never merge because the offenses are crimes of dissimilar import based on their definition. The state presented a similar argument to the Supreme Court in the *Ruff* case, which involved the offenses of aggravated burglary and rape. The court, however, "decline[d] to create an absolute rule based on the definition of the offense." *Ruff*, ___ Ohio St.3d ___, 2015-Ohio-995, ___ N.E.3d ___, at ¶ 28. Accordingly, we reject the state's argument, but we move to the animus inquiry of the *Ruff* tripart test.

**{¶86}** "Animus," as contemplated by the merger statute, means "purpose, or more properly, immediate motive," and "requires us to examine the defendant's mental state in determining whether two or more offenses may be chiseled from the same criminal conduct." *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979), cited in *State v. Chaffer*, 1st Dist. Hamilton No. C-090602, 2010-Ohio-4471, ¶ 11. We determine the animus, one's immediate motive or purpose, by dissecting the facts and circumstances in evidence, including the means used to commit the offense. *See Logan* at 131. *Accord State v. Tibbs*, 1st Dist. Hamilton No. C-100378, 2011-Ohio-6716, ¶ 43-48.

**{¶87}** Here, the record demonstrates that Bailey gratuitously and repeatedly inflicted serious physical harm on Miller. He choked her with her scarf, crushing her windpipe. He beat her in the face so hard that her eyes swelled shut and her right medial orbital fractured. While she was in this state, he stabbed her in the neck with a butter knife, and he later threatened to kill her. The manner in which the harm was inflicted, in conjunction with the other circumstances, including no evidence that she resisted the attack, demonstrated that Bailey acted with a specific intent to seriously harm Miller. Therefore, we hold that the two offenses were committed with a separate animus and, thus, they were separately punishable under R.C. 2941.25.

**{¶88}** In summary, we hold that the burglary, robbery, and felonious-assault offenses did not merge. Thus, we overrule the assignment of error.

## III. Conclusion

**{¶89}** Because Bailey has failed to demonstrate the errors assigned, we affirm the trial court's judgment. But we remand the cause for the trial court to place of record a corrected sentencing entry indicating that Bailey was convicted of felonious assault in violation of R.C. 2903.11(A)(1), and that the sentences are to be served consecutively. The court should also incorporate the R.C. 2929.14(C)(4) consecutive-sentencing findings into the corrected sentencing entry.

Judgment affirmed and cause remanded.

**HENDON, P.J.,** and **DEWINE, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.