[Cite as *State v. Morris*, 2022-Ohio-4597.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


|                          |   |                              |
|--------------------------|---|------------------------------|
| STATE OF OHIO,           | : | APPEAL NO. C-220073          |
|                          |   | TRIAL NO. B-2003352          |
| Plaintiff-Appellee,      | : |                              |
|                          |   |                              |
| vs.                      | : | *O P I N I O N.*             |
|                          |   |                              |
| JANICE MORRIS,           | : |                              |
|                          |   |                              |
| Defendant-Appellant.     | : |                              |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: December 21, 2022


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Law Office of John D. Hill* and *John D. Hill, Jr.*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

**{¶1}** Janice Morris appeals her conviction, after a bench trial, for aggravated assault along with a gun specification for firing an AR-15 at her husband Romyl Williams. In one assignment of error, Morris contends her conviction was against the manifest weight of the evidence because she acted in self-defense as a battered woman. For the following reasons, we affirm the trial court's judgment.

## Relevant Facts

**{¶2}** In July 2020, Janice Morris was indicted for felonious assault with firearm specifications in violation of R.C. 2903.11(A)(2). After a bench trial, the court found her guilty of the inferior offense of aggravated assault, and a gun specification. The court sentenced her to six months' incarceration for the aggravated assault and three years' incarceration for the gun specification.

**{¶3}** At the trial, the state introduced evidence that Janice Morris fired an AR-15 at her husband Romyl Williams causing him serious physical harm. There was no dispute that Morris fired the rifle. The issue at trial was whether Morris acted in self-defense.

**{¶4}** During the trial, Williams testified that he had been married to Morris for five years, but the couple had been experiencing serious marital problems. According to Williams, Morris had a violent temper and was physically abusive toward him. More recently, Williams had taken a second wife as is customary in his Muslim faith, and Morris did not want him to have a second wife. Williams, who had warned Morris that he would leave her if she hit him again, had decided to end the marriage.

**{¶5}** The night before Morris fired the gun at him, the two had argued about his second wife. Morris was angry because she thought he was texting his other wife while they were lying in bed. Morris took his phone and left the bedroom. Williams

went to sleep, and in the morning, Morris asked if they could discuss their issues. Williams told her there was nothing to talk about and finished his coffee. He went to the bathroom, and while he was sitting on the toilet, Morris kicked the door open and entered the bathroom with the rifle pointed at him. While Morris was trying to cock the gun, Williams jumped off the toilet and grabbed the gun. The two wrestled for the gun and ended up in the hallway outside of the bathroom and toward the kitchen. While in the hallway, Morris fired the gun, and something hit Williams's hand and leg. They continued to wrestle for the rifle, and she fell on her back. Williams got on top of her and tried to keep the rifle pointed away from him while Morris kept firing it.

{¶6} Morris stopped firing, presumably because the gun was out of bullets, and Williams got the gun from her and dropped it on the floor. Morris ran from the kitchen to the bedroom, to retrieve a pistol that was kept in the bedroom in a nightstand next to her side of the bed. Unbeknownst to Morris, the previous night, Williams had moved the pistol from the nightstand to the closet due to her behavior. Williams retrieved the pistol, pointed it at her, and yelled, "Stop, stop, stop." Morris ran outside screaming, "Help, help, my husband is trying to kill me."

{¶7} Williams grabbed his phone from the bathroom, called the police, grabbed his son, and went outside. Williams crossed the street, still carrying the pistol, and waited for the police in a parking lot.

{¶8} Cincinnati Police Officer Timothy Watson was the first to arrive on the scene. Watson told Williams to place the gun on the ground and walk to his cruiser. Other officers secured the gun and took the child. Watson observed blood on Williams's hands and leg, a scrape or burn mark on the back of his knuckles, a scrape or burn on the palm of his hand, numerous cuts on his leg, and a deep gouge or burn

to his leg that looked like a graze from a bullet. While Williams was being treated, Watson entered the home.

{¶9} Watson testified that eight shell casings from the rifle were found on the kitchen floor, and several floor tiles and the sink were damaged. When he spoke with Morris, she said that she was upset at Williams about something on Facebook. She also stated that Williams was abusive toward her. Morris did not deny firing the gun. Watson transported Morris to the Hamilton County Justice Center. When the deputies searched her, they found a round of the same caliber as the shell casings in her pocket. Morris placed the round into an evidence envelope and submitted it with her other property.

{¶10} The state's final witness was Detective Charles Zophi, an investigator for the Cincinnati Police Department. Although he was not assigned to the case, Zophi was on duty when Williams went to the police station to turn in his wife's cell phone. Williams believed that Morris had planned the attack based on some videos he found on the phone. Zophi obtained a search warrant and downloaded the content of the phone. Two of the videos were self-recordings that Morris had made six hours before the shooting. Morris expressed her love for her children and said, "If you all seeing this video, you all know why," and "Sometimes you gotta do what you gotta do."

{¶11} Morris presented the testimony of two experts, Dr. Nancy Schmidtgoesling and John Dixon. Dr. Nancy Schmidtgoesling opined that Morris was a battered wife who had been controlled and abused by Williams. John Dixon, a firearms and shooting reconstruction expert, concluded that the rifle was not fired in the bathroom due to the lack of damage to the tile walls, tile floor, sink, and toilet. He further testified that had Morris pointed the rifle at Williams while he was sitting on

4

the toilet, the muzzle would almost be touching him because the distance from the door to the toilet was the same length of the rifle.

{¶12} Morris testified in her own defense. She discussed her history of abuse that began during her childhood and resulted in a general fear of men. Morris began dating Williams when she was a teenager, and they resumed their relationship when he was released from prison. After her marriage, Morris converted to Islam. Williams was very controlling of her and her children, physically violent, and isolated her from her friends and family. Morris kept notes of the physical abuse by documenting her injuries with photos, and several photos showing previous injuries were admitted into evidence.

{¶13} Morris testified that Williams constantly cheated on her, and when he took a second wife the previous month, his time was split between two households. Morris liked the arrangement because she spent more time with her children and less time with Williams. Recently, Morris's son Lamar had moved into the home. Morris testified that Williams was angry that Lamar was residing in the home because he had "kicked Lamar out" of the home a few years earlier.

{¶14} When asked about the videos, Morris explained that she wanted her children to know that she loved them. She further explained that she was afraid that Williams was going to kill her. Morris recorded the second video because she forgot to mention her youngest son in the first video. In the last video, Morris expressed her wishes that her car be given to Lamar because she did not have a will. Morris recorded the videos the night before the shooting while sitting in her car.

{¶15} When she awoke the next morning, Williams was standing over her threatening her with a gun in his hand. When she told him she loved him and would

tell Lamar to leave, Williams calmed down and left the bedroom. Morris, who was afraid he might kill her, decided to take the rifle out of the closet and hide it. While he was in the kitchen, Morris hid the rifle outside.

{¶16} After she returned, Williams noticed the rifle was missing and became angry. He repeatedly asked her where it was, and Morris denied any knowledge of its location. Finally, Williams warned her that if she did not tell him where it was in five minutes, he would "fuck you and your son up, bitch." While Morris pretended to look for the gun, Williams took his handgun and went down to the basement where the kids were sleeping.

{¶17} Morris went outside to retrieve the rifle. When she reentered, Williams charged up the stairs with the gun in his hand and "bum-rushed" her. She fell to the floor with the rifle in her hand, and they started wrestling over the gun. Her initial thought was to continue shooting the gun to empty it. Morris was fighting for her life because he was holding the muzzle trying to make her shoot herself. Finally, he grabbed the gun, pointed it at her, and pulled the trigger, but the gun was empty. Morris ran out of the house to a neighbor's home. She told the neighbor to call the police because her husband was trying to kill her. Then she ran home to protect her son Lamar. Morris called 911 and reported that her husband was trying to kill her, and she pulled out a gun. The 911 operator advised her to go outside, and she was arrested when she left the home. After Morris's testimony, the defense rested.

{¶18} The trial court "believe[d] that she tried to shoot him * * * under the influence of a rage. * * * And I think he provoked her. And so she shot at him." The court found her guilty of aggravated assault and the second gun specification. The

court sentenced her to six months incarceration on the aggravated assault and three years on the gun specification to be served consecutively.

## Law and Analysis

**{¶19}** In one assignment of error, Morris contends her conviction was contrary to the manifest weight of the evidence.

**{¶20}** In reviewing a weight-of-the-evidence claim, we review " 'the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *Bailey* at ¶ 63.

**{¶21}** Self-defense through the use of deadly force is present where: (1) the accused was not at fault in creating the situation giving rise to the affray, (2) the accused (even if mistaken) had a bona fide belief that she was in imminent danger of death or great bodily harm and her only means of escape from such a danger was in the use of such force, and (3) the accused did not violate any duty to retreat or avoid the danger. *State v. Smith*, 1st Dist. Hamilton No. C-190507, 2020-Ohio-4976, ¶ 48. The elements of self-defense are cumulative, and a defendant's claim of self-defense fails if any one of the elements is not present. *Id.*

**{¶22}** R.C. 2901.05 places the burden on the state "to disprove at least one of the elements of self-defense beyond a reasonable doubt." The state is not required to prove a defendant did not act in self-defense until the defendant introduces evidence

tending to support she acted in self-defense. R.C. 2901.05(B)(1). "Once the initial showing is made, the burden of persuasion requires the state to disprove at least one of the elements of self-defense (or defense of another) beyond a reasonable doubt." *Smith* at ¶ 49.

{¶23} As to the first element of self-defense, a person may not provoke an assault or voluntarily enter an encounter and then claim a right of self-defense. *See id.* at ¶ 53. With respect to the second element of self-defense, expert testimony on battered woman syndrome is admissible to establish the defendant's belief of an imminent danger of death or great bodily harm to justify the use of such force. *See State v. Koss*, 49 Ohio St.3d 213, 217, 551 N.E.2d 970 (1990).

{¶24} Morris argues that her conviction was against the manifest weight of the evidence because the evidence demonstrated that she acted in self-defense as a battered woman. In finding Morris guilty, the trial court found that Morris fired the gun due to rage and provocation and not a belief that she was in imminent danger of death or great bodily harm. The court was in the best position to assess the credibility of the witnesses and resolve the conflicting testimony, and we defer to the factfinder regarding the credibility of the witnesses. Based on this record, we cannot conclude that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Accordingly, we overrule the sole assignment of error.

## Conclusion

{¶25} Having overruled Morris's assignment of error, we affirm the trial court's judgment.

Judgment affirmed.

8

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.